The GREYHOUND CORPORATION et al.,
Defendants-below-Appellants,

v.

Arnold HEITNER, as custodian for Mark Andrew Heitner, Plaintiff-below-Appellee.

Supreme Court of Delaware.

Argued Oct. 15, 1975.

Decided April 15, 1976.

Richard F. Corroon and Richard E. Poole of Potter, Anderson & Corroon, Wilmington, for defendant-appellant The Greyhound Corp.

Max Terry, Jr., of Terry, Terry & Jackson, Dover, and William W. Schwarzer and Lynn H. Pasahow of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for individual defendants-appellants.

Joshua M. Twilley of Twilley, Jones & Feliceangeli, Dover, and Michael F. Maschio and Carol Faye Simkin of Cowan, Liebowitz & Latman, P.C., New York City, for plaintiff-appellee.

Before DUFFY and McNEILLY, JJ., and TAYLOR, Judge.

DUFFY, Justice:

The single question at issue in this appeal is the constitutionality of the Delaware Sequestration Statute and the related procedures thereunder. In our view, they do not violate due process of law requirements and, accordingly, we affirm the judgment of the Court of Chancery.

I.

The Sequestration Statute, 10 Del.C. § 366, has been an integral part of our law since 1927.[1] 35 Del.L. ch. 217; *Sands v. Lefcourt Realty Corporation*, Del.Supr., 35 Del.Ch. 340, 117 A.2d 365 (1955). Over the years since then a long line of cases has established the purpose of the Statute, its rationale and the procedure thereunder. Reference is made to those cases for a fuller definition of such matters.[2]

1. In its present form 10 Del.C. § 366 provides:

"(a) If it appears in any complaint filed in the Court of Chancery that the defendant or any one or more of the defendants is a non-resident of the State, the Court may make an order directing such nonresident defendant or defendants to appear by a day certain to be designated. Such order shall be served on such nonresident defendant or defendants by mail or otherwise, if practicable, and shall be published in such manner as the Court directs, not less than once a week for 3 consecutive weeks. The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults. Any defendant whose property shall have been so seized and who shall have entered a general appearance in the cause may, upon notice to the plaintiff, petition the Court for an order releasing such property or any part thereof from the seizure. The Court shall release such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured. If such petition shall not be granted, or if no such petition shall be filed, such property shall remain subject to seizure and may be sold to satisfy any judgment entered in the cause. The Court may at any time release such property or any part thereof upon the giving of sufficient security.

"(b) The Court may make all necessary rules respecting the form of process, the manner of issuance and return thereof, the release of such property from seizure and for the sale of the property so seized, and may require the plaintiff to give approved security to abide any order of the Court respecting the property.

"(c) Any transfer or assignment of the property so seized after the seizure thereof shall be void and after the sale of the property is made and confirmed, the purchaser shall be entitled to and have all the right, title and interest of the defendant in and to the property so seized and such sale and confirmation shall transfer to the purchaser all the right, title and interest of the defendant in and to the property as fully as if the defendant had transferred the same to the purchaser in accordance with law."

2. See, for example, *Sands v. Lefcourt Realty Corporation* supra; *Greene v. Johnston*, Del.Supr., 34 Del.Ch. 115, 99 A.2d 627 (1953); *Loft, Inc. v. Guth*, Del.Supr., 25 Del.Ch. 363, 19 A.2d 721 (1941); *Gordon v. Michel*, Del.Ch., 297 A.2d 420 (1972); *Trans World Airlines, Inc. v. Hughes Tool Company*, 41 Del.

In *Ownbey v. Morgan*, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), the United States Supreme Court held that the Delaware foreign attachment statute was constitutional and, since the equitable remedy under § 366 is analogous to foreign attachment, *Sands v. Lefcourt Realty Corporation* supra, it is fair to say that *Ownbey* has been long regarded by the Courts of this State as authority for the constitutionality of the Sequestration Statute. Cf. *Wiley v. Copeland,* Del.Supr., 349 A.2d 211 (1975); *Gordon v. Michel* supra.

By its nature a foreign attachment, whether legal or equitable, involves a prejudgment seizure of property as a basis for jurisdiction and/or as a source of satisfaction for any judgment ultimately awarded on the merits of the claim. Such a proceeding has the seeds if not the fruits of unfairness in permitting the impounding of property before judgment and, under some circumstances, upon thin assertions of right. But, as the discussion by Justice Pitney in *Ownbey* demonstrates, the practice traces its origin to early colonial days and, indeed, beyond them to the "custom of London." In law, however, as in the life it reflects, what is old is not necessarily good. Neither, we hasten to add, is it necessarily bad. But, as we are often reminded, due process concepts involve evolving standards of fairness and so the test for constitutionality is necessarily dynamic. Much has been decided and written about such concepts in recent years including their implications for Delaware sequestration procedures. See, for example, the thoughtful study by Folk and Moyer, *Sequestration in Delaware: A Constitutional Analysis,* 73 Colum.L.Rev. 749 (1973).

For present purposes the current due process standards must largely be distilled from a quartet of decisions by the United States Supreme Court, all of which involved prejudgment seizures of property; they are: *North Georgia Finishing, Inc., v.*

*Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant Company,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L. Ed.2d 349 (1969).

Those decisions provide a foundation for renewed constitutional attack upon the Sequestration Statute. The argument seems first to have been made in the Court of Chancery in *Gordon v. Michel* supra, but it was rejected as the Court concluded that *Ownbey* remained viable and that 10 *Del.C.* § 366 still passed constitutional muster. Following *Gordon* other Chancery decisions reached the same result. Then in *Wiley v. Copeland* supra this Court, in a brief *per curiam* opinion, found § 366 constitutional on the same rationale announced in *Gordon.*

This appeal came on for hearing shortly after *Wiley* was decided but we permitted full exploration of the issues in briefing and at oral argument because of the important questions involved, and because certain arguments are made herein which were not fully answered in *Wiley.*

Against that background, we now focus on this appeal.

II.

This is a stockholder's action, derivative in character and brought on behalf of The Greyhound Corporation (Greyhound) against some twenty-eight individuals (defendants) including directors of Greyhound (or its corporate predecessors) who served at various times between 1957 and 1974. The complaint alleges that Greyhound suffered significant loss and damage as a result of conduct by defendants which is said to have caused Greyhound to be found (by the United States District Court for the Northern District of Illinois) in vi-

Ch. 11, 187 A.2d 350 (1962); *Cantor v. Sachs,* 18 Del.Ch. 359, 162 A. 73 (1932);

Folk, *The Delaware General Corporation Law,* p. 565.

olation of certain antitrust laws. The complaint also attacks the distribution of benefits under Greyhound's deferred compensation and stock option plans.

None of the defendants is a Delaware resident, all were served under the Sequestration Statute and relevant Rules of the Court of Chancery. Apparently, the Court-appointed Sequestrator seized certain Greyhound shares of stock and/or contract rights which defendants, respectively, had under agreements with Greyhound. The Court of Chancery denied both a motion by the individual defendants to dismiss the complaint for lack of jurisdiction and a motion by all defendants to vacate the order of sequestration. This appeal followed.

### III.

The thrust of defendants' argument is that the sequestration procedure is inconsistent with controlling constitutional principles. They say that the procedure, including that which obligates them to appear generally before defending on the merits, violates their right to due process of law.

Defendants argue that the minimum contacts requirements of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), must be met before *personam* jurisdiction is assumed and they say that they are entitled to a meaningful right to be heard under *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), before their property may be seized. And, they continue, the passage of time and changing concepts of due process "have rendered *Ownbey* obsolete."

### A.

There are significant constitutional questions at issue here but we say at once that we do not deem the rule of *International Shoe* to be one of them. An argument based on that case was made in *Breech v. Hughes Tool Company,* Del.Supr., 41 Del. Ch. 128, 189 A.2d 428 (1963), and rejected by this Court. Compare *Hibou, Inc. v. Ramsing,* Del.Super., 324 A.2d 777 (1974). We are not persuaded that *Breech* should now be abandoned. The reason, of course, is that jurisdiction under § 366 remains, as it was in 1963, *quasi in rem* founded on the presence of capital stock here, not on prior contact by defendants with this forum. Under 8 Del.C. § 169 [3] the "situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . [is] in this State", and that provides the initial basis for jurisdiction. Delaware may constitutionally establish situs of such shares here, *Rogers v. Guaranty Trust Co. of New York,* 288 U. S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1932); *Jellenik v. Huron Copper Min. Co.,* 177 U. S. 1, 20 S.Ct. 559, 44 L.Ed. 647 (1900), it has done so and the presence thereof provides the foundation for § 366 in this case. Cf. *Breech v. Hughes Tool Company,* supra. On this issue we agree with the analysis made and the conclusion reached by Judge Stapleton in *U. S. Industries, Inc. v. Gregg,* D.Del., 348 F.Supp. 1004 (1972).

We hold that seizure of the Greyhound shares is not invalid because plaintiff has failed to meet the prior contacts tests of *International Shoe.*

As to *Boddie,* we agree that it contains an important summary of due process requirements, including a "meaningful opportunity" to be heard before one is deprived of any significant property interest. But

---

3. 8 Del.C. § 169 reads in full as follows:
   "For all purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for the purpose of taxation, the situs of the owner-

ship of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this State."

the implications of *Boddie* for this appeal may best be understood, not by reference to its general principles but in light of an analysis of *Sniadach, Fuentes, Mitchell* and other cases dealing with foreign attachments. And now we turn to those cases.

#### B.

In *Sniadach,* decided in 1969, the Supreme Court invalidated on due process grounds a Wisconsin statute which authorized garnishment of wages, at the request of a creditor's lawyer, before trial without any opportunity for the wage owner to be heard or to tender a defense. In the absence of "notice and à prior hearing," said the Court, the procedure was deemed unconstitutional. But, writing for the Court, Justice Douglas recognized an *Ownbey* exception in so many words; after referring to seizure without notice or hearing he said:

"Such summary procedure may well meet the requirements of due process in extraordinary situations. . . . *Ownbey v. Morgan* . . .." 395 U.S. at 339, 89 S.Ct. at 1821.

Some three years later the Court decided *Fuentes,* in which it invalidated Florida and Pennsylvania prejudgment replevin statutes applied to household goods sold under conditional sales contracts. The statutes denied the purchasers the opportunity to be heard before seizure and that, said the Court, violated due process, in each instance. The writ issued on bare assertions of right and in neither State was a judge involved. Speaking for the Court, Justice Steward said:

"We hold that the Florida and Pennsylvania prejudgment replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor. . . ." 407 U.S. at 97, 92 S.Ct. at 2002.

But, citing *Boddie,* he stated that there "are 'extraordinary situations' that justify postponing notice and opportunity for a hearing"; and he added a footnote, saying:

"In three cases, the Court has allowed the attachment of property without a prior hearing. In one, the attachment was necessary to protect the public against the same sort of immediate harm involved in the seizure cases—a bank failure. *Coffin Brothers & Co. v. Bennett,* 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768. Another case involved attachment necessary to secure jurisdiction in state court—clearly a most basic and important public interest. *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L. Ed. 837." *Fuentes v. Shevin,* supra, 407 U.S. at 91, 92 S.Ct. at 1999, n. 23.

Two years later the Court decided *Astol Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed. 2d 452 (1974), in which citing *Fuentes, Sniadach* and *Boddie* it again found and applied in Justice Brennan's language "one of those 'extraordinary situations' that justify postponing notice and opportunity for a hearing." In applying the "limited circumstance" test stated in *Fuentes,* he noted that the seizure (of a yacht) served a significant governmental purpose by permitting Puerto Rico to assert *in rem* jurisdiction over the property in order to conduct forfeiture proceedings; the following footnote was cited to that quotation, again implicitly approving *Ownbey:*

"Cf. *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 [17 A.L.R. 873] (1921), cited with approval in *Fuentes v. Shevin,* supra, 407 U.S. at 91 n. 23, 92 S.Ct. [1983] at 1999 [32 L.Ed. 2d 566]."

It seems clear from the writing of three different Justices in the above three cases that until May 15, 1974 *Ownbey* was still viable for some purposes; indeed, all three had referred to the case by name, with explicit or implicit approval.

The next case in time, *Mitchell*, was also decided in 1974. There Justice White referred to prejudgment seizures approved under the special circumstances found in *Ewing v. Mytinger and Casselberry*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) and then said,

"More precisely in point, the Court had unanimously approved prejudgment attachment liens effected by creditors, without notice, hearing or judicial order, saying that 'nothing is more common than to allow parties alleging themselves to be creditors to establish in advance by attachment a lien dependent for its affect upon the result of the suit.' 'The fact that the execution is issued in the first instance by an agent of the State but not from a court, followed as it is by personal notice and a right to take the case into court, is a familiar method in Georgia and is open to no objection.' *Coffin Brothers v. Bennett* . . .. To the same effect was the earlier case of *Ownbey v. Morgan* . . .. Furthermore, based on *Ownbey* and *Coffin,* the Court later sustained the constitutionality of the Maine attachment statute. *McKay v. McInnes,* 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975 (1928). The judgment of the Maine court was affirmed without opinion, citing *Ownbey* and *Coffin.*" *Mitchell v. W. T. Grant Company,* supra, 416 U.S. at 613, 94 S.Ct. at 1903.

While the Court's discussion of *Ownbey* is arguably less than explicit approval, it seems clear that it was not overruled and, indeed, in our view the Court looked to it as precedent for approval of the Louisiana sequestration statute in *Mitchell.*

In 1975 the Court decided *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* supra, in which it invalidated a Georgia garnishment statute that permitted prejudgment seizure of property on an affidavit of plaintiff or his attorney. The Court noted that in *Fuentes,* Fourteenth Amendment violations were found "[b]ecause the official seizures had been carried out without notice and without opportunity for a hearing or other safeguard against mistaken repossession" and, said Justice White for the Court, "[t]he Georgia statute is vulnerable for the same reasons." While his opinion does not refer to *Ownbey,* the concurrence by Justice Powell cites it as an illustration of "unanimously approved prejudgment attachment liens" under the "traditional view of procedural due process."

C.

▇▇▇ While the significance of these decisions for foreign attachment statutes in the States is by no means complete, or clear, we can, we think, draw two inferences from what the Court has said about *Ownbey.* First, an attachment which is necessary to secure jurisdiction in a State court is an "extraordinary situation" under *Boddie.* *Fuentes* so holds in so many words (denoting it as "clearly a most basic and important public interest") and the same view is echoed in *Astol Calero-Toledo,* in *Mitchell* and by Justice Powell in his concurring opinion in *North Georgia.* The second inference is that, given an "extraordinary situation", pre-seizure notice and hearing are not required by the due process clause,[4] *Jonnet v. Dollar Savings Bank,* 3 Cir., 530 F.2d 1123 (1976). Those inferences seem reasonable and they are certainly addressed to the common sense of what is involved: prior notice of seizure would permit a defendant to divest the court of a jurisdiction which, by definition,

---

4. It is not clear whether the presence of adequate safeguards alone will comport with due process where there was no pre-seizure notice and hearing, or whether the safeguard procedure is available only under extraordinary situations as identified in *Boddie.* We need not decide the question because, for the reasons already stated, we think that the United States Supreme Court has said that *Ownbey* qualified under *Boddie* and so, inferentially, does § 366.

it has over the *res*—he could simply take it out of the State or defeat jurisdiction by a transfer of title. And a plaintiff would thus lose a right, which he would otherwise have, to take the case into court. We hold that § 366 is not unconstitutional because seizure precedes notice and hearing.

In *North Georgia* the Supreme Court based its ruling on the absence of "notice and . . . opportunity for a hearing or other safeguard." The disjunctive character of that quotation from Justice White supports our conclusion that prior notice and hearing are not mandated by the Fourteenth Amendment. But "other safeguards" are required if the sequestration procedure is to square with the Constitution. So we must now examine § 366 from that point of view. Precisely what requirements the Court has in mind for safeguards is not certain but some insight is available from what it has approved and what it has criticized. It has said, for example, that there must be a hearing and judicial determination "before one is finally deprived of his property," *Mitchell v. W. T. Grant Company*, supra. And in *North Georgia* the Court made a number of criticisms about the procedure, including the fact that the writ issued at the order of a clerk without participation by a judge, the affidavit was sufficient with conclusory allegations made by an attorney without personal knowledge of the facts, the debtor was deprived of the use of the property and there was no provision for an early hearing.

■ Since the requirements of due process " 'are not technical, nor is any particular form of procedure necessary,' " *Mitchell v. W. T. Grant Company*, supra, we deem it unnecessary to litmus test Delaware sequestration procedure against every facet of the foreign attachment proceedings approved or invalidated in the governing cases we have reviewed. We review, rather, certain of the significant features of the Delaware procedure which seem relevant to the respective interests of the parties.

### D.

As the Third Circuit said in *Jonnet*, a plaintiff has two interests in invoking foreign attachment procedures: to establish jurisdiction in the forum and to restrain a *res* within the control of the Court for eventual payment of a judgment. In Delaware the first of these is the principal and under most circumstances the exclusive basis for sequestration. Indeed, by its terms § 366 permits the "Court [to] . . . compel the appearance of the defendant by the seizure," a purpose underscored by the cases. Cf. *Sands v. Lefcourt Realty Corporation*, supra; *Gordon v. Michel*, supra.

On this point we pause to note, as did the Vice Chancellor, that *Sniadach, Fuentes, Mitchell* and *North Georgia* all involved prejudgment seizures, by attachment proceedings, for the purpose of collecting moneys claimed to be owed. And so did the most recent decision by the Supreme Court on this question: *Carey v. Sugar*, 425 U.S. 73, 96 S.Ct. 1208, 47 L. Ed.2d 587, 44 L.W. 4416 (1976). All of those cases involve claims by creditors against resident debtors, none sought attachment to establish state jurisdiction which is what this appeal is all about.[5] While that difference may be determinative in distinguishing this case from creditor type cases, we do not base our conclusion on it.

As to safeguards or protection of a defendant's interest, the following appear significant to us:

(1) An order of Court is required to initiate the § 366 process and, beyond doubt, that requires an order of a Judge of the

---

5. The statute permits seizure only if defendant is a non-resident. See § 366, *Wife v. Husband*, Del.Ch., 271 A.2d 51 (1970). Compare *Astol Calero-Toledo v. Pearson Yacht Leasing Co.*, supra.

Court of Chancery who has control of the process at all times.

■ (2) The property to be seized must be identified with reasonable certainty in the Court order.[6] *Cannon v. Union Chemicals & Materials Corp.*, 37 Del.Ch. 399, 144 A.2d 145 (1958). Compare *Baker v. Gotz*, D.Del., 336 F.Supp. 197 (1971), aff'd 3 Cir., 492 F.2d 1238, cert. den. 417 U.S. 955, 94 S.Ct. 3084, 41 L.Ed.2d 674 (1974).

■ (3) The value of the property seized must be reasonably related to the amount of the claim asserted.[7] *Trans World Airlines, Inc. v. Hughes*, 40 Del.Ch. 523, 185 A.2d 762 (1962), aff'd 40 Del.Ch. 552, 185 A.2d 886 (1962).

■ (4) Following seizure, notice thereof must be promptly given to defendant. § 366, Chancery Rule 4(db).

■ (5) A general appearance is required before release of property seized, but under both the statute and the Chancery practice a defendant has a right to appear solely for the purpose of attacking compliance with § 366 and the Rules of Court.[8] *Schwartz v. Miner*, 36 Del.Ch.

481, 133 A.2d 599 (1957). Indeed, defendants are doing that very thing here without having made a general appearance. If sequestration is determined to be valid, each defendant has an option to appear generally or not.[9] *Schwartz v. Miner*, supra.

(6) After seizure a defendant who has entered a general appearance may petition for release of the property and the "Court shall release such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured."

■ (7) A defendant who elects to appear generally after seizure will be called upon to litigate only those causes of action asserted against him in the original complaint; he may not be confronted with new causes of action. *Tenney v. Jacobs*, Del.Supr., 240 A.2d 138 (1968); *Townsend Corporation of America v. Davidson*, 40 Del.Ch. 295, 181 A.2d 219 (1962).

■ (8) While the property seized is in the control of the Court, a defendant

6. Chancery Rule 4(db) provides in part:
   "No order shall be entered under 10 Del.C. § 366 unless it appears in the complaint that the defendant or any one or more of the defendants is a nonresident of the State of Delaware and the application therefor is accompanied by the affidavit of a plaintiff or other credible person stating:
   (a) As to each nonresident defendant whose appearance is sought to be compelled, his last known address or a statement that such address is unknown and cannot with due diligence be ascertained.
   (b) The following information as to the property of each such defendant sought to be seized:
   (1) A reasonable description thereof.
   (2) The estimated amount and value thereof.
   (3) The nature of the defendant's title or interest therein; and if such title or interest be equitable in nature, the name of the holder of the legal title.
   (4) The source of affiant's information as to any of the items as to which the affidavit is made on information and belief.

   (5) The reason for the omission of any of the required statements."

7. Sequestration is available only when a money judgment is sought. *Steinberg v. Shields*, 38 Del.Ch. 349, 152 A.2d 113 (1959).

8. Such an appearance is made under Chancery Rule 12(b) by filing a motion to dismiss for lack of jurisdiction. In earlier days a "special appearance" was permissible for the same purpose. See, for example, *Wightman v. San Francisco Bay Toll-Bridge Co.*, 16 Del.Ch. 200, 142 A. 783 (1928).

9. Discovery is available for the purpose of determining whether there has been an effective sequestration, cf. *Kolyba Corp. v. Banque Nationale de Paris*, Del.Ch., 316 A.2d 585 (1973), but it may not be had for a fishing expedition to find property subject to seizure. *Chasin v. Gluck*, Del.Ch., 216 A.2d 142 (1965).

does not lose all rights over it. Thus the sequestration order entered in this case, which follows what we understand to be the usual practice, states:

"4. In the event that the defendants or any one of them shall make a bona fide sale or sales of any of the aforesaid property seized hereunder, and shall receive therefor not less than the market price at the time of sale and shall deposit with the Sequestrator the proceeds of such sale or sales, the Sequestrator shall forthwith advise the Greyhound Corporation of such facts and thereupon the property sequestered and seized and so sold shall be released from such sequestration and seizure without further action of any kind by the Sequestrator or this Court; and in such event, the proceeds of any such sale shall be held by the Sequestrator until further order of this Court in lieu of the property initially seized and so sold; provided, further, that the proceeds of any such sale or sales shall be subject to investment and reinvestment by the Sequestrator in such property and upon such terms and conditions as the defendants may from time to time direct in writing, provided always that the property in which such proceeds are invested and reinvested (as well as any uninvested proceeds of any sale of such property) shall be held by and in the name of the Sequestrator, pursuant to the terms of this Order and until further Order of this Court.

"In the event that said Greyhound Corporation shall desire to make any payments under any agreement, contract or other legal instrument of any kind whatsoever between any of said defendants and said corporation being seized under this Order by the Sequestrator, any such obligations, rights, debts or credits may be discharged by the payment of the sums due from said corporation, as may be appropriate, to the Sequestrator and said corporation, as may be appropriate, may receive a full and complete discharge of said contractual obligations, rights, debts or credits from each or any of said defendants, and the Sequestrator hereinbefore appointed; and in such event, the proceeds of the payment of any of the aforesaid contractual obligations, rights debts or credits shall be held by the Sequestrator until the further order of this Court in lieu of the contractual obligations, rights, debts, or credits initially seized and so paid or discharged, provided further that the proceeds of any such payment or payments shall be subject to investment and reinvestment by the Sequestrator upon such terms and conditions as each or any of said defendants may from time to time direct in writing; provided always that the property in which such proceeds are invested and reinvested (as well as any uninvested proceeds of any such payment) shall be held by and in the Sequestrator, pursuant to the terms of this Order and until the further Order of this Court."

In addition to those safeguards, we think that there is another (from a defendant's point of view) which has not been emphasized in the cases but which is implicit in § 366. The statute permits a defendant who has appeared generally to petition for release of seized property and

"[t]he Court shall release such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured."

In order to make such a determination the Court of necessity must be informed not only of the value of the property seized but also of what effect release of the property will have on satisfaction of any judgment which plaintiff may secure. To know that, i. e., what judgment may be secured, the Court must be informed about the possible amount of such judgment and, clearly, that means at least some prelimi-

nary inquiry into the merits of the claim. Cf. *Carey v. Sugar*, supra. Compare Vice Chancellor Marvel's 1969 ruling in *Trans World Airlines, Inc. v. Hughes*, supra in which he said that ". . . of course, the property . . . seized should always bear some reasonable relationship to the amount of the claim asserted." Manifestly, the complaint or other statement by a plaintiff cannot be conclusive on the value or merits of the claim.

In sum, the sequestration procedure is at all times under the control of a judge; a defendant has a right to litigate compliance with the Statute and the Rules of Court without appearing generally; if the Court determines that there has been a valid seizure a defendant may then elect to appear generally; if he does so appear he is entitled to release of the property unless plaintiff meets the statutory terms; and a defendant is entitled to a hearing to test the reasonableness of the value of the property seized, including to the extent pertinent, the merits of plaintiff's claim.

■ In our view, § 366 and the related procedures provide a reasonable balancing of interests between plaintiff and defendants and assure to the latter the safeguards required under current guidelines established by the United States Supreme Court.

E.

Defendants' argue also that compelling them to make a general appearance before defending on the merits violates their right to due process. They rely principally on decisions by Courts in New York holding that an obligation under a liability insurance policy may be a basis for jurisdiction over personal injury litigation, but liability of a non-resident defendant who appears is limited to the face value of the policy. *Farrell v. Piedmont Aviation, Inc.*, 2d Cir., 411 F.2d 812 (1969); *Minichiello v. Rosenberg*, 2d Cir., 410 F.2d 106 (1968), cert. den., 396 U.S. 844, 90 S.Ct. 69, 24 L.Ed.2d 94 (1969); *Jarvik v. Magic Mountain Corp.*, S.D.N.Y., 290 F.Supp. 998 (1968);

*Simpson v. Loehmann,* 21 N.Y.2d 305, 287 N.Y.S.2d 633, 234 N.E.2d 669 (1967), rearg. den., 21 N.Y.2d 990, 290 N.Y.S.2d 914, 238 N.E.2d 319 (1968).

We do not regard the rationale of those cases as persuasive authority for the due process argument which defendants make here. As the cited cases indicate, the theory of suit and the practice thereunder spawned a considerable volume of Federal-State litigation which has apparently resulted in settled law in New York. But the attachment theory and the limited liability imposed on an appearing defendant have apparently been adopted only in New York. See *Ann.* 33 A.L.R.3d 992. And even in New York the doctrine is limited to claims based on an insurance policy. Thus in *Simpson v. Loehmann* the New York Court of Appeals said:

"This, it is hardly necessary to add, means that there may not be any recovery against the defendant in this sort of case in an amount greater than the face value of such insurance policy even though he proceeds with the defense on the merits. Consideration of CPLR 320 (subd. [c]) and its effect in other types of action begun by attachment must, of course, await future cases." 290 N.Y.S. 2d at 916, 238 N.E.2d at 320.

We decline to proceed here on the basis of what New York alone has done in personal injury claims under insurance policies.

■ We agree with Judge Stapleton also when he said in *U.S. Industries*, 58 F. R.D. 469, at 479, that there is a "legitimate public interest behind the general appearance rule"; it promotes judicial economy by concentrating the settlement of claims in one jurisdiction or action. And, that is particularly desirable in the kind of controversy here involved. According to the amended complaint, this is essentially an intra-corporate dispute between a complaining shareholder, who sues for the corporation, alleging loss and damage result-

ing from conduct of defendants in their respective capacities as directors and/or officers of Greyhound. The charges are that defendants caused the Corporation to be in contempt of orders of the United States District Court for which substantial fines were imposed on Greyhound, caused Greyhound to violate the anti-trust laws, and unjustly enriched themselves through stock options and deferred compensation plans. Such a controversy surely has a substantial relationship to this forum, *Folk and Moyer* supra, and litigation here will eliminate the posibility of duplicate actions elsewhere with varying results.

We hold that § 366 is not unconstitutional because it requires defendants to appear generally before defending on the merits.

### IV.

Defendants argue also that the sequestration procedure is unconstitutional as applied to the interests of security holders whose certificates are located outside the State. They say that the certificates for the seized shares are physically outside Delaware and that the statutory attempt under 8 Del.C. § 169 to reserve the situs of shares here is "to indulge in a fiction."

The argument is based largely, if not exclusively, on the right of a bona fide purchaser who acquires a certificate and, so far as we are informed, there is no such purchaser among defendants. As to these defendants, we have already determined that the shares have a situs here, *Rogers v. Guaranty Trust Co. of New York*, supra; *Jellenik v. Huron Copper Min. Co.*, supra; *U. S. Industries, Inc. v. Gregg*, supra; compare *Breech v. Hughes Tool Company*, supra, and, for present purposes that is conclusive on this contention.

### V.

■ Finally, we turn to the argument made by Greyhound Corporation, for whose benefit plaintiff alleges that he sues.

Greyhound says that the sequestration order deprives it of property without due process of law. It attacks that part of the order under which the Sequestrator directed it "not to transfer or permit to be transferred any of said shares of stock," (*i. e.*, the seized shares) except pursuant to Court order. Relying on *Haas v. Haas*, 35 Del.Ch. 392, 119 A.2d 358 (1955), Greyhound argues that the individual defendants retain the power to pass good title to their shares to a good faith purchaser and that under the Uniform Commercial Code (6 Del.C. §§ 8–301, 8–102, 8–105) such a transferee would take title unaffected by the sequestration proceedings; and, Greyhound continues, it would be obliged to transfer the shares on its books or be liable for any loss resulting from a refusal or a delay in doing so. 6 Del.C. § 8–401(2).[10]

The Vice Chancellor disposed of Greyhound's argument on the basis of the Uniform Commercial Code, 6 Del.C. § 8–317, which reads:

> "Nothing contained in this subtitle shall repeal, amend or in any way effect the provisions of sections 169 and 324, title 8, or sections 365 and 366, and chapter 35, title 10; and to the extent that any provision of this title is inconsistent with such sections, sections 169 and 324, title 8, and 365 and 366 and chapter 35, title 10, shall be controlling."

He noted the priority of § 366 by the terms of the Uniform Commercial Code and suggested that Greyhound could find protection by complying with the sequestration order and § 8–317.

As to Greyhound's reliance on *Haas,* he said that the conflict there did not involve a sequestration order and UCC priorities, and that defendants remain free to transfer their stock under the order of sequestration and the general practice. Cf.

---

10. 6 Del.C. § 8–401(2) provides:
   "Where an issuer is under a duty to register a transfer of a security the issuer is also liable to the person presenting it for registration or his principal for loss resulting from any unreasonable delay in registration or from failure or refusal to register the transfer."

*Trans World Airlines, Inc. v. Hughes Tool Company,* supra.

In this Court Greyhound points to a number of situations in which it might be caught in a legal dilemma and be faced with a claim for loss. These all contemplate a transfer by a defendant in violation of the sequestration order or a claim by a bona fide purchaser who was made so by a defendant under circumstances which violate the order of sequestration.

None of such facts or claimants are before the Court.

We recognize the desirability of quieting fears about the free transferability of shares traded on a national stock exchange but we are not persuaded that that or any other reason advanced by Greyhound provides a basis on which this Court can or should state an opinion. In brief, there is not before us a controversy calling for a judicial judgment, even on a declaratory basis. Accordingly, we decline to decide the issue.

Affirmed in all respects except as noted in Section V.